UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                  :

TARGET CORPORATION,                      :

                          Plaintiff,   :

                                          :            15 Civ. 6614 (LGS)

              -against-                 :

                                         :          **OPINION AND ORDER**

RICHRELEVANCE, INC.,               :

                           Defendant.  :

------------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:__02/13/17____ |

LORNA G. SCHOFIELD, District Judge:

        This case was filed after Plaintiff Target Corp. ("Target") terminated its contract with Defendant RichRelevance, Inc. ("RichRelevance"), which had allowed RichRelevance to provide services to third parties that placed advertisements on Target's website. Under the contract, the parties shared the revenue from these online advertisements. Target sues RichRelevance, alleging it breached the parties' contract by failing to remit Target's portion of the revenue. RichRelevance asserts seven counterclaims (the "Counterclaims"), including that Target breached the contract by failing to share revenue derived from Target's advertising agreements with third parties executed after the contract's termination. Target moves for summary judgment on its breach of contract claim and on all Counterclaims. For the following reasons, the motion is granted in part and denied in part.

## I.     BACKGROUND

        The following facts are drawn from the evidence submitted by the parties in connection with the present motion. For purposes of this motion, all factual disputes are resolved, and all reasonable inferences are drawn, in favor of RichRelevance. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016).

### A.      The Agreement

Target is a retailer that operates stores nationwide and a retail website, Target.com. Target's website includes space for third parties to place advertisements.  RichRelevance provides services that help third parties display advertisements on the websites of its business partners.

In June 2010, RichRelevance and Target executed a written agreement (the "Agreement").  Under the Agreement, RichRelevance was to provide advertising services -- referred to as Enrich for Brands or E4B Services ("E4B Services") -- that enabled third-party advertisers to promote products and services on Target's website.  New York law governs the Agreement.

The Agreement contains the following defined terms:  Each third-party advertiser is a "Brand."  "E4B Placements" are the "placements of Target Creative[1] and Brand advertising collateral within Onsite Display Inventory."  "Onsite Display Inventory" is the "space on Target['s] Website onto which RichRelevance may sell and serve E4B Placements as more particularly described in an Insertion Order."  An "Insertion Order" is the "order form and related terms and conditions entered into between RichRelevance or Target and a Brand or [its] agent . . . for the serving of E4B Placements."  The Agreement requires the parties to share "Brand Funds," which refers to the revenue paid "in connection with the E4B Placements less any out-of-pocket creative costs incurred by RichRelevance in providing E4B Services."

---

[1] The provision regarding Target Creative states: "Upon request from RichRelevance, Target shall, in its sole discretion, provide creative elements for inclusion in E4B Placements, including without limitation Target logos, trademarks, Target or third party product images or other graphic design elements ('Target Creative')."

The E4B Services that RichRelevance provides include "sourc[ing] Brands interested in promoting products or services in exchange for Brand Funds" and "execut[ing] Insertion Orders with such Brands or their respective agents . . . for the placement of E4B Placements and the payment of Brand Funds to Target or RichRelevance."  According to witnesses, "sourcing" refers to the process of establishing a business relationship with a Brand, which involves finding Brands interested in advertising opportunities and having them commit to placing advertisements on Target's website.  The Agreement obligates Target, among other things, to "display the E4B Placements sold by RichRelevance on [Target.com] and otherwise adhere to the terms of the Insertion Order or other agreement executed by RichRelevance for the sale of such E4B Placements."

In exchange for the E4B Services, RichRelevance is entitled under the Agreement to a certain percentage of "any Brand Funds related to E4B Placements."  The Agreement defines RichRelevance's portion of Brand Funds as "E4B Fees."

The parties' dispute in part turns on the E4B Fees provision.  Between 2010 and 2013, the parties executed a written amendment each year that extended the applicability of the provision's "fee schedule."  As of March 2013, the E4B Fees provision provided: "For the one year period starting February 1, 2013 RichRelvance shall be entitled to 35% of any Brand Funds related to E4B Placements that are earned for Target by RichRelevance from Brands where the Insertion Order was sourced or negotiated from the efforts of RichRelevance plus additional cash bonuses" in specified amounts.  In August 2013, the parties amended the E4B Fees provision to eliminate the cash bonuses and, "[e]ffective August 1, 2013," to increase the percentage for E4B Fees "from 35% to 45% for any Insertion Orders that were sourced or negotiated from the efforts of RichRelevance."  The amendment set the "revenue share percentage" for a term of one year,

3

"through July 31, 2014 and, upon written notice from Target to RichRelevance prior to July 31, 2014, . . . extended to January 31, 2015."  Target did not extend the percentage beyond July 31, 2014.

The E4B Fees provision also includes "Audit Rights."  It states that "[e]ither party may, upon reasonable written notice during the Term . . . examine the other party's accounting records related to the amounts due hereunder."  RichRelevance gave written notice of an audit request, which Target declined.

The Agreement sets forth additional "Advertising Obligations," three of which are relevant here.  First, "Target shall make Onsite Display Inventory available to RichRelevance for sale to Brands throughout the Term as determined by Target, in its sole discretion."  Second, "[t]he parties shall work together to . . . avoid channel conflict for the sales of E4B Placements."  Third, "Target shall promptly notify RichRelevance if Target is approached by a potential Brand in relation to a potential sale of E4B Placements to such Brand."

The Agreement also provides that "[a]ny waiver, amendment or modification of any provision of this Agreement must be in writing and executed by both parties."

### B.      The Parties' Dealings with Brands and Advertising Agencies

Throughout the term of the Agreement, RichRelevance worked primarily with advertising agencies that provide advertising services to companies and manage each company's "National Brand Funds" budget.  Target's Director of Digital Vendor Marketing ("DVM"), David Peterson, testified that Target had not been "pursuing the sale of online advertising in the [N]ational [B]rand [F]unds space" and instead hired RichRelevance to do so.  According to Peterson, National Brand Funds refer to money that is aimed to "drive brand awareness" and "total sales."

While RichRelevance worked primarily with agencies that handled companies' National Brand Funds budgets, Target interacted directly with the companies -- i.e, the brands. Specifically, Target worked with a brand's representative who handled that brand's "shopper-marketing" budget for advertisements.  For instance, RichRelevance worked with the advertising agency Mediavest, which managed the National Brand Funds budget of Proctor & Gamble ("P&G").  Target worked with P&G directly to sell advertisements funded through its shopper-marketing budget.  As Peterson testified, Target had no prior dealings with Mediavest, and RichRelevance "sourced" the relationship for Target.

RichRelevance's process for selling advertising to Mediavest on behalf of P&G usually began with negotiating the annual "upfront."  William Vail, who was RichRelevance's Vice President of Sales, testified that an "upfront" is a "promise of a commitment for advertising" and acknowledged that it formed "the baseline for the advertising spend for that year."  Vail worked on the upfronts with Mediavest throughout the Agreement.  He testified that the upfront was important to securing P&G-related business.  As he explained, "you have the formalized upfront documentation, and then you have RFPs" -- i.e., "a request for a proposal for individual brands to run campaigns on Target.com" -- "that are in addition to that upfront. . . .  [I]f you get the final yes on the upfront, you secure the majority of those RFPs.  If you don't, you don't."  Vail clarified that with the "P&G relationship through Media[v]est," RFPs could "come in throughout the year" on a "rolling" basis after the upfront.

### C.    RichRelevance's October 2012 Presentation

In October 2012, RichRelevance's CEO, David Selinger, presented to Target a strategy for earning $50 million in online advertisement revenue for the following year.  Peterson had facilitated the meeting, provided input to RichRelevance on the presentation's content and

proposed the $50 million revenue target.  Selinger testified that Peterson told him before the meeting that Target was "having a bad year," it "need[ed] to do something" and RichRelevance was "the best path."

At the presentation, Selinger displayed a PowerPoint entitled "The Path to $50 Million." The PowerPoint indicates that the revenue goal depended on the "Three Pillars of Success" -- "Alignment," "Data" and "Inventory."  Alignment refers to "Execution Calendar Alignment" and a "Consolidated Account Execution Plan."  Data refers to Target introducing "offline data" to its "reports" that would help assess an advertising campaign's effectiveness.  Inventory refers to the amount of space or types of placements that RichRelevance could offer to third-party advertisers on Target's website.  The presentation states that in order to achieve the revenue goal, there was "[z]ero-wiggle room on [the] 3 pillars."

Casey Carl, Target's Chief Strategy and Innovation Officer, was present at the October presentation and was the decision-maker with respect to the RichRelevance proposal.  As Selinger testified, immediately after the presentation, Carl told him that Target needed "to get this business to 50 million dollars," that "RichRelevance [was] the only way by which [Target] believe[d]" it could "get there" and that "if this is the plan that can get [Target] there, let's go."

RichRelevance and Target began discussing RichRelevance increasing its spending on resources to help Target achieve its goal.  A few weeks after the presentation, RichRelevance's Vice President of Emerging Businesses, Janet Megdadi, sent an email recounting a discussion she had with Peterson in which they discussed the need for RichRelevance to increase spending on personnel and office space.  In February 2013, Peterson received an email stating that RichRelevance had "added 8 new people across sales and marketing ops since we last met in Jan[uary] . . . and expressed our concern with their staffing levels."

###### D.      The Alleged Channel Conflict with Mediavest

Around April 2014, Peterson and several team members met with representatives of P&G and Jyoti Menon, who worked for Mediavest.  They discussed Target working directly on both P&G's shopper-market budget and its National Brand Funds budget, which RichRelevance had previously handled.

The April 2014 meeting was not the first time that Target had discussed transitioning away from RichRelevance.  In February 2014, Target's National Partnership Manager, Jackie Bosacker, sent an email to Peterson in which she wrote that she "assum[ed] that we plan to cut ties with [RichRelevance] in July" and recommended not making "new products," such as "brand pages," available to it.  She also stated, "[a]t a time when not only DVM but Target as a whole is moving from [RichRelevance] I believe limiting our business relationship with them is the best thing to do especially because [RichRelevance] will soon be an active competitor in the marketplace selling against us."

On May 8, 2014, RichRelevance's President, Eduardo Sanchez, sent an email to Peterson regarding the "Q2 Forecast."  He wrote that although RichRelevance "received $7.9M in RFPs from P&G over the last several days," the "$7.9M appears to be degrading into $2.9M" because of a lack of access to "brand page[s]" for certain products.  The next day, Peterson wrote Sanchez an email after speaking with him.  He stated that although he and Sanchez had "discussed the current P&G business and how [they] could work to provide the pieces needed to close the business," two "things at play" made Target's decision "complex."  First, he cited the parties' "current rev[enue] share agreement and channel conflict."  Second, he emphasized that "P&G [was] looking to work directly with" Target, that "[t]his direction is from the top of our organizations" and that "[t]he Shopper and National teams are collaborating on how we can bring these objective[s] together."

On the same day that Peterson sent an email to Sanchez, he also sent an email to his co-workers recounting his dinner from the previous night with Mediavest's employee, Menon. Peterson and Menon had discussed the timing of transitioning from RichRelevance to Target. Peterson had also told Menon that RichRelevance could not provide the same "capabilities" as Target.  One week later, Peterson sent an email to Menon stating, "[g]iven where we are in our transition with [RichRelevance] and our ramp-up to serve you and the P&G business, please go ahead and send the Up Front Directive to us directly."  RichRelevance had negotiated all previous upfronts with Mediavest.

### E.  Termination of the Agreement

The Agreement provides that either party could terminate it so long as that party gave "at least [thirty] days prior written notice."  Section 2 of the Agreement states that certain obligations "will survive termination of this Agreement for any reason."  This includes "all obligations to make payments of amounts that are or become due under this Agreement prior to or following termination" and "all Insertions Orders executed prior to termination."

On June 25, 2014, Target provided RichRelevance with written notice that Target was terminating the Agreement effective August 1, 2014.  On August 7, 2014, Mediavest awarded the 2014-2015 P&G upfront to Target.

After the Agreement was terminated, RichRelevance continued to collect Brand Funds, including over $3 million that constitute Target's share of the Brand Funds under the Agreement. Between April 2014 and October 2015, RichRelevance collected $9,250,877.26, which "under the [Agreement] is due to Target on a gross basis against which . . . RichRelevance would have offset any amounts owed by Target to . . . make a net payment to Target."

F.      **Procedural History**

Target filed suit against RichRelevance in August 2015, alleging that RichRelevance breached the Agreement by failing to pay the $9,250,877.26 owed to it under the Agreement. RichRelevance answered and asserted seven Counterclaims against Target.  In addition to three claims for breach of contract, RichRelevance asserts claims for promissory estoppel, intentional interference with prospective economic advantage, unjust enrichment and declaratory judgment. Target moves for summary judgment in its favor on both its breach of contract claim and on RichRelevance's seven Counterclaims.

II.     **STANDARD**

Summary judgment is appropriate where the record before the court establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  Fed. R. Civ. P. 56(c)(1); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Victory v. Pataki*, 814 F.3d 47, 58–59 (2d Cir. 2016).  Courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.  *See Anderson*, 477 U.S. at 255.  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (internal quotation marks and citation omitted).  Instead, a party

asserting that a fact is genuinely disputed "must support the assertion" by citing to the record or showing that "the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

## III.   DISCUSSION

### A.   Breach of Contract Based on the E4B Fees Provision (Counterclaim One)

Counterclaim One alleges that Target breached the Agreement by failing to remit RichRelevance's portion of Brand Funds where the Insertion Order was sourced or negotiated from the efforts of RichRelevance both before and after the termination of the Agreement.  The parties dispute whether RichRelevance is entitled to revenue from contracts Target signed after the Agreement's termination where RichRelevance played a role in sourcing the business before termination.  Summary judgment is granted in Target's favor because the Agreement unambiguously does not entitle RichRelevance to proceeds from advertising contracts executed after the termination of the Agreement.

"[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (internal quotation marks omitted) (applying New York law).  Whether a contract provision is ambiguous is a question of law.  *Id.*

New York law provides that "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003) (internal quotation marks omitted); *accord Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995).  "Where the language chosen by the parties has a definite and precise meaning, there is no

ambiguity." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (internal quotation marks omitted). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Id.* (internal quotation marks omitted). Thus extrinsic evidence "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

The Agreement provides that RichRelevance is owed E4B Fees, which are a percentage of "any Brand Funds related to E4B Placements that are earned for Target by RichRelevance from Brands where the Insertion Order was sourced or negotiated from the efforts of RichRelevance." The August 2013 amendment to the Agreement provides that, "[e]ffective August 1, 2013," the E4B Fees equal "45% for any Insertion Orders that were sourced or negotiated from the efforts of RichRelevance, and that have campaigns that commence on or after such date." Accordingly, the Agreement limits RichRelevance's E4B Fees to Brand Funds based on Insertion Orders.

The advertising contracts that Target executed post-termination are unambiguously not Insertion Orders that generate Brand Funds under the Agreement. An "Insertion Order" is an "order . . . for the serving of E4B Placements." E4B Placements are "placements of . . . Brand advertising collateral within Onsite Display Inventory." That is, E4B Placements are only those advertisements placed within Onsite Display Inventory. Onsite Display Inventory, in turn, refers to "the space on Target['s] website onto which RichRelevance may sell and serve E4B Placements." If the designated space on Target's website is not a space onto which RichRelevance "may sell and serve" advertisements, it is not Onsite Display Inventory. Thus

absent Onsite Display Inventory, there can be no E4B Placements, which are necessary to generate Brand Funds and an Insertion Order.

RichRelevance has not adduced evidence that Target's post-termination contracts, such as with Mediavest, resulted in advertisements being placed on Onsite Display Inventory. Target's obligation to provide Onsite Display Inventory ceased upon termination of the Agreement. RichRelevance cites no evidence that despite the termination, Target nonetheless provided Onsite Display Inventory -- i.e., space on its website onto which RichRelevance may sell and serve advertisements.[2] Because the online advertisements stemming from the contracts Target executed post-termination were not placed within Onsite Display Inventory, they were not E4B Placements. Those advertisements did not generate Brand Funds and, in turn, RichRelevance is not entitled to a portion of the revenue these advertisements generated.

RichRelevance's alternative interpretation is inconsistent with the plain meaning of the Agreement and conflicts with the Agreement's express time limits. The Agreement provides that the "revenue share percentage [of 45%]," which was effective August 1, 2013, "shall apply through July 31, 2014" and may be extended several months if Target gives RichRelevance notice. Because there is no evidence of any such written notice, the fee percentage expired on July 31, 2014. RichRelevance's interpretation would require the parties to apply the revenue share percentage to contracts executed after that percentage lapsed.

RichRelevance's other arguments also are unavailing. First, it argues that adopting a contrary interpretation would render Section 2(c) meaningless. "A reading of the contract should

---

[2] The sole exception, which requires Target to provide Onsite Display Inventory post-termination, is to accommodate Insertion Orders executed prior to termination. As the Agreement expressly states, obligations connected to pre-termination Insertion Orders "survive termination."

not render any portion meaningless." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). Section 2(c) provides that "all obligations to make payments of amounts that are or become due under this Agreement prior to or following termination" will "survive termination." The parties' conduct, however, defeats the contention that Section 2(c) must include Target's contracts entered post-termination. Despite termination, RichRelevance has continued to collect millions of dollars in Brand Funds under the Agreement -- a fact the parties do not dispute -- apparently from Insertion Orders entered pre-termination, as RichRelevance has not adduced any evidence that these Brand Funds are based on post-termination Insertion Orders. Section 2(e) expressly states that termination does not affect payment obligations associated with Insertion Orders executed before termination. Thus, contrary to RichRelevance's argument, its interpretation is not necessary to give Section 2(c) meaning.

Second, RichRelevance also claims that Target's interpretation would render the Agreement "commercial nonsense" because Target could avoid paying RichRelevance for its efforts simply by terminating the Agreement. This appeal to the equities is unavailing on this contract claim. RichRelevance's interpretation ignores the Agreement's definition for "Insertion Orders" and instead seeks to apply the E4B Fees provision to *any advertising contract* "sourced" by RichRelevance's efforts. Yet courts "may not by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing." *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (N.Y 2009) (internal quotation marks omitted).

In sum, the advertising contracts that Target entered into after termination were unambiguously not Insertion Orders that generated Brand Funds -- the only revenue the parties must share under the Agreement. Summary judgment is granted on Counterclaim One.

**B.      Breach of Contract Based on Channel Conflict Provision and Prompt-Notification Provision (Counterclaim Two)**

Counterclaim Two alleges Target breached the Agreement's provision that requires the parties to "work together to . . . avoid channel conflict for the sales of E4B Placements." Summary judgment on this Counterclaim is denied because a reasonable jury could find that Target's conduct in 2014 breached this provision.

Although the Agreement does not expressly define the term channel conflict, the parties agree that a channel conflict occurs when one party is working with a brand or its agency and the other party begins negotiating with that same brand or agency. Target's own witness acknowledged that it would be a "channel conflict" for Target to speak "with Media[v]est about taking over [P&G] business before the relationship with RichRelevance was terminated."

A reasonable jury could conclude that Target did just that before the Agreement terminated on August 1, 2014. As early as February 2014, Target was considering "cut[ting] ties with [RichRelevance] in July" and considered "limiting [its] business relationship with [RichRelevance]" to be "the best thing to do." In April 2014, Peterson met with Mediavest and P&G to discuss Target's handling P&G's National Brands Funds-related advertising in place of RichRelevance. Construing the evidence in the light most favorable to RichRelevance, this meeting was part of Target's pre-existing plan to take its dealings with Mediavest in-house. In May 2014, Peterson met with Menon and discussed Mediavest's transition from RichRelevance to Target. A week later, Peterson instructed Menon to "send the Up Front Directive to us directly," even though RichRelevance had handled all previous upfront negotiations. A reasonable jury could conclude that Target's private discussions with Mediavest amounted to a breach of Target's obligation to work with RichRelevance to avoid a channel conflict.

A reasonable jury could also conclude that Target's conduct resulted in damages.  Shortly before Peterson met with Menon, he received an email from Bosacker suggesting that he ask Menon if Mediavest could "start holding RFP's or only issuing RFP's with an end date of 7/31/14."  As Bosacker advised, "we will want to be very strategic in what I/O's [Insertion Orders] we tell P&G to run through [RichRelevance] at this point."  The same day, Bosacker sent another internal email to Peterson and said, "I would like P&G to only submit IO's [Insertion Orders] back to [RichRelevance] that have an end date of 7/31.  They would then issue a new IO to us running from 8/14-6/15."  Based on this evidence, and the fact that Mediavest awarded Target the 2014-2015 upfront in August 2014, a reasonable jury could conclude that RichRelevance suffered damages resulting from Target's efforts to limit the number and timing of RFPs and Insertion Orders.

Target argues that it is entitled to summary judgment because, according to Peterson, P&G initiated the communications with Target and Mediavest.  Even so, a reasonable jury still could conclude that Target failed to work with RichRelevance to avoid a channel conflict by not involving RichRelevance in its discussions with Mediavest.

Target also cites a May 2014 email from Selinger (RichRelevance's CEO) in which he wrote that "a transfer of part or all of the [P&G] business is 100% ok with me and part of the healthy 'give-and-take' in a partnership as we have -- so long as we're proactive, thoughtful and transparent with another."  While Target may have factual arguments it can raise at trial, Selinger's statement only highlights, and does not resolve, the factual dispute that precludes summary judgment on the channel conflict portion of Counterclaim Two.

For the same reasons, summary judgment is also denied on Counterclaim Two to the extent it alleges Target breached the provision that requires Target to "promptly notify

RichRelevance if Target is approached by a potential Brand in relation to a potential sale of E4B Placements to such Brand."

### C.       Breach of Contract for Audit Rights (Counterclaim Three)

Counterclaim Three alleges that Target breached RichRelevance's audit rights under the Agreement when Target denied RichRelevance access to Target's accounting records upon RichRelevance's request.  Summary judgment in Target's favor is granted because RichRelevance fails to raise a genuine factual dispute that Target breached the Agreement.

The Agreement's "Audit Rights" provision provides that "[e]ither party may, upon reasonable written notice . . . examine the other party's accounting records related to the amounts due hereunder."  RichRelevance's sole argument is that it is entitled to examine Target's records because there are "amounts due" under the Agreement, namely, the revenues earned from the advertising contracts that Target entered post-termination with the parties for which RichRelevance had "sourced" the relationship.

As explained above, the revenue collected from these contracts neither constituted Brand Funds nor were based on Insertion Orders and, as a result, RichRelevance is not entitled to a portion of this revenue under the Agreement.  Consequently, RichRelevance is not entitled to review any related accounting records.  Summary judgment on Counterclaim Three is granted.

### D.       Promissory Estoppel (Counterclaim Four)

Counterclaim Four alleges promissory estoppel based on RichRelevance's October 2012 presentation and subsequent communications between the parties.  Under New York law, "[t]he elements of a promissory estoppel claim are: (i) a sufficiently clear and unambiguous promise; (ii) reasonable reliance on the promise; and (iii) injury caused by the reliance."  *Castellotti v.*

*Free*, 27 N.Y.S.3d 507, 513 (1st Dep't 2016).  Because any reliance by RichRelevance on Target's statements was unreasonable as a matter of law, summary judgment is granted.

The Agreement provides that any "amendment" or "modification of any provision of th[e] Agreement must be in writing and executed by both parties."  The Agreement details the parties' obligations regarding inventory, data and the extent to which they must cooperate. RichRelevance cannot have reasonably relied on any alleged oral promises regarding altering existing inventory, data sharing or the so-called alignment obligations "because the agreement between the parties contained an unambiguous no-oral-modification clause."  *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 524 (S.D.N.Y. 2009); *see, e.g.*, *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 577 (2d Cir. 2010) (summary order) (applying New York law and holding that the plaintiff "could not reasonably have relied on . . . [a] purported oral promise . . . because such a representation modifies the relationship between the parties established by the [written] Agreement, which by its terms can only be done in writing"); *Bank of N.Y. v. Spring Glen Assocs.*, 635 N.Y.S.2d 781, 784 (3d Dep't 1995) ("[D]efendants' estoppel argument is unavailing as they could not have justifiably relied on such an [oral] assurance, given the express language in the [contracts] declaring that no modification or waiver of their terms . . . can be brought about except by a signed writing.").  Summary judgment on Counterclaim Four is granted.

### E.    Tortious Interference with Prospective Economic Advantage (Counterclaim Five)

Counterclaim Five alleges that Target committed the tort of intentionally interfering with prospective economic advantage by intentionally disrupting RichRelevance's relationship with Mediavest.  Under New York law, "[t]o prevail on a claim for tortious interference with business relations," which is "also known as tortious interference with prospective economic advantage,"

17

a plaintiff "must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (internal quotations marks omitted) (apply New York law).  Summary judgment is granted because RichRelevance has adduced no evidence that Target acted for a wrongful purpose or used improper means.

"[T]he 'wrongful means' element sets a high bar." *Id.* at 262.  It requires a plaintiff to show "that 'the defendant's conduct . . . amount[ed] to a crime or an independent tort'" or that the "defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (first and second alteration in original) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)).  Some courts have also recognized that wrongful means may include "extreme and unfair economic pressure."  *See, e.g.*, *New Stadium LLC v. Greenpoint-Goldman Corp.*, 843 N.Y.S.2d 290, 291 (1st Dep't 2007).  Wrongful means, however, do not "include persuasion alone although it is knowingly directed at interference with the contract." *Carvel*, 818 N.E.2d at 1104 (internal quotation marks omitted).

RichRelevance fails to adduce any evidence of wrongful means.  RichRelevance argues that Target "affirmatively misrepresented RichRelevance's capabilities and effectively slandered RichRelevance" to Mediavest.  RichRelevance cites a May 2014 email in which Peterson stated that he told Menon that it "was not the case" that Mediavest could get "many of the capabilities [they had] been" discussing through RichRelevance, and a June 2014 email in which Target offered Mediavest "unique and exclusive" capabilities for advertising.  But RichRelevance has

submitted no evidence that these statements were false or otherwise constituted a crime or an independent tort.

RichRelevance also fails to adduce evidence that Target exerted extreme and unfair economic pressure on Mediavest.  RichRelevance again cites Target's statements to Mediavest that Target could provide services that RichRelevance could not.  Yet RichRelevance cites no evidence or offers any explanation as to how Target's offer of better services exerted extreme economic pressure on Mediavest or was unfair.  *See id.* at 1105 (noting that offering "attractive prices" for a product was not "pressure" but "legitimate 'persuasion'").

RichRelevance's tortious interference claim is also precluded by the Agreement, which governs the parties' interactions with third-party advertisers.  Where, as here, the alleged wrong states a claim for breach of contract, New York law requires the claim to "be determined by the contracts between the parties, not by courts or juries seeking after the fact to devise a code of conduct."  *Id.* (rejecting tortious interference claim based on allegation that franchisor was competing with franchisee, noting that the contract "expressly dealt with the question of when competition would be forbidden").  Summary judgment on Counterclaim Five is granted.

### F.      Unjust Enrichment (Counterclaim VI)

Counterclaim Six is pleaded in the alternative, to the extent the breach of contract claims do not survive.  RichRelevance argues its unjust enrichment claim is based on three theories: (1) Target's alleged failure to adhere to the commitments under the Three Pillars, (2) Target's intentional interference with RichRelevance's relationship with Mediavest and (3) Target's denial of RichRelevance access to premium inventory.  Because each theory fails, summary judgment is granted.

To plead a claim of unjust enrichment, "the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks omitted). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

First, as to Target's alleged failure to follow the Three Pillars, RichRelevance does not cite any evidence that Target was enriched by its conduct. Rather, the only evidence it cites relates to the resources that RichRelevance expended in reliance on Target's alleged promises. Absent evidence that Target benefitted, RichRelevance cannot sustain an unjust enrichment claim on this basis.

Second, as to Target's alleged interference with the Mediavest relationship, it is duplicative of its surviving contract Counterclaim and is therefore precluded. *Id.*

Third, as to Target's allegedly denying RichRelevance certain premium inventory in 2014, RichRelevance claims this conduct violated the Agreement's channel conflict provision because it was part of Target's strategy to "usurp" the business from Mediavest. This theory is also duplicative of the surviving contract Counterclaim. Consequently, summary judgment is granted on Counterclaim Six for unjust enrichment.

### G. Declaratory Judgment (Counterclaim Seven)

Counterclaim Seven seeks a declaratory judgment that Target's conduct breached the Agreement and that it is entitled to Brand Funds under the Agreement. Courts routinely dismiss requests for declaratory judgment that duplicate breach of contract claims. *See, e.g.*, *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 472 (S.D.N.Y. 2014); *Camofi Master LDC v. Coll.*

*P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (Chin, J.); *see also City of Perry v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 286 (S.D.N.Y. 2016) (dismissing declaratory judgment claim as duplicative where "the better remedy for the relief [the plaintiff] seeks is adjudication of its state-law claims").  RichRelevance concedes that a declaratory judgment is "unnecessary."  Because the Counterclaim for declaratory judgment merely duplicates the surviving contract Counterclaim, summary judgment is granted in Target's favor.

### H.    Target's Breach of Contract Claim (Claim One)

Target argues that it is entitled to summary judgment on its breach of contract claim because the parties do not dispute that RichRelevance owes Target $9,250,877.26 in Brand Funds, which RichRelevance collected from April 2014 through October 2015.  Summary judgment on this claim is denied because there is a genuine factual dispute as to whether Target substantially performed under the Agreement.

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).  "Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract."  *Id.*  "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007); *see also Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) ("[I]n most cases, the

question of materiality of breach is a mixed question of fact and law -- usually more of the former and less of the latter -- and thus is not properly disposed of by summary judgment.").

For the reasons discussed above, the evidence presents a genuine factual dispute whether Target violated the Agreement by failing to "work together" with RichRelevance to "avoid channel conflict for the sales of E4B Placement." This evidence raises a factual question of whether Target substantially failed to perform, thereby excusing RichRelevance's performance beginning around April 2014. Summary judgment is thus improper on Target's contract claim.

Target argues that RichRelevance waived its right to raise the alleged breach because RichRelevance continued to collect Brand Funds even after learning that Target was in contact with Mediavest. This argument is rejected. "A breach of contract may be waived by the non-breaching party." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 584–85 (2d Cir. 2006) (citing *N.Y. Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295, 297 (N.Y. 1940)). "[W]aiver of a contract right 'is the voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved.'" *Id.* (second alteration in original) (quoting *Jefpaul Garage Corp. v. Presbyterian Hosp.*, 462 N.E.2d 1176, 1177 (N.Y. 1984)). It "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) (internal quotation marks omitted). However, "mere silence, oversight or thoughtlessness in failing to object to a breach of the contract will not support a finding of waiver." *Beth Israel Med. Ctr.*, 448 F.3d at 585 (internal quotation marks omitted). "The intent to waive is usually a question of fact." *Id.* (alterations omitted) (quoting *Jefpaul Garage*, 462 N.E.2d at 1178–79).

To support its argument that RichRelevance's failure to disclaim the breach constitutes waiver, Target cites a May 2014 email from Peterson to RichRelevance acknowledging that P&G was "looking to work directly" with Target.  However, RichRelevance's decision to continue to collect revenue after this email does not demonstrate, as a matter of law, that it intended to waive its right to assert a breach.  For instance, Selinger (of RichRelevance) testified that he was unaware in May 2014 of the full extent of Target's dealings with Mediavest.  A reasonable jury could infer that RichRelevance did not waive a right to assert a breach it did not know had occurred.  Also, the Agreement provides that a failure of either party "to exercise any right provided for by this Agreement shall not be deemed a waiver of that right."  In light of this reservation of rights, a reasonable jury could conclude that RichRelevance's alleged failure to disclaim the breach in May 2014 did not evince an intent to waive its rights.  *See Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 67 (S.D.N.Y. 2010) ("A party does not make 'ma[k]e the conscious choice' to waive its rights by explicitly reserving its power to enforce them." (quoting *Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000))).

Accordingly, summary judgment is denied on Target's breach of contract claim.

## IV.   CONCLUSION

For the foregoing reasons, Target's motion for summary judgment is GRANTED in its favor on Counterclaims One, Three, Four, Five, Six and Seven and DENIED on Counterclaim Two and on Target's breach of contract claim.  Target's request for oral argument is DENIED as moot.

The Clerk of Court is directed to close the motion at Docket Number 72.

Dated: February 13, 2017
       New York, NY

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**